**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ROBERT EARL JOHNSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:08-cv-806** |
| | ) | |
| **TONY PARKER, Warden,** | ) | **Judge Trauger** |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

Petitioner Robert Earl Johnson, proceeding *pro se*, is an inmate at the West Tennessee State Penitentiary in Henning, Tennessee. He brings this action pursuant to 28 U.S.C. § 2254 against Tony Parker, Warden of the facility, seeking a writ of habeas corpus.

**I.      BACKGROUND and PROCEDURAL HISTORY**

The petitioner here, Robert Johnson, and his brother, Roderick Johnson, were both indicted by a Davidson County grand jury on one count of first-degree premeditated murder in connection with the killing of William Edwin Binkley on October 24, 1997.[1] The two brothers were tried together before a jury in the Davidson County Criminal Court. On November 20, 1998, the jury found Roderick Johnson guilty of second-degree murder, but found the petitioner, Robert Johnson, guilty of first-degree murder. After a sentencing hearing, the jury unanimously found the presence of an aggravating circumstance—that is, that "the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," Tenn. Code Ann. § 39-13-204(i)(5)—as a result of which the petitioner was sentenced to life in prison without the possibility of parole. On direct appeal, Robert Johnson's judgment and sentence were affirmed by the Tennessee Court of Criminal Appeals on October 8, 2001. Johnson filed a petition for post-conviction relief in the trial court. Counsel was appointed, an evidentiary hearing was conducted, and the trial court denied relief on July 19, 2006. The Court of Criminal Appeals affirmed the denial of the petition for post-conviction relief on July 18, 2007. The Tennessee Supreme Court denied the

---

[1] Roderick Johnson's conviction and sentence are not at issue here.

application for further review by order entered December 16, 2007.

Johnson filed the instant petition for writ of habeas corpus (ECF No. 2) on July 16, 2008, asserting fourteen separate "grounds" for relief. From these fourteen grounds, read in conjunction with the petitioner's brief and discussion of those "grounds," the court gleans twenty-two separate claims for relief, as follows:

1. That the trial court erred in admitting the photographic line-up arrays at trial (Ground one);

2. That the evidence was insufficient to support the petitioner's conviction for first-degree murder (Ground one);

3. That the trial court erred in admitting the victim's hearsay statements (Ground two);

4. That the trial court erred when it allowed the victim's mother, Frances Hampton, to testify in violation of Rule 615 of the Tennessee Rules of Evidence (Ground three);

5. That the trial court erred by allowing the prosecutor to make improper and prejudicial remarks during closing argument (Ground four);

6. That the trial court erred in not instructing the jury regarding the minimum mandatory length of a sentence for life imprisonment (Ground five);

7. That the trial court's jury instructions were confusing and misleading (Ground five);

8. That law enforcement did not adequately investigate the case (Ground six);

9. That the state failed to prove the statutory aggravating circumstance beyond a reasonable doubt (Ground seven);

10. That the state improperly suppressed medical records (Ground seven);

11. That the state's introduction of testimony from William S. Greenup violated the Confrontation Clause (Ground seven);

12. That trial counsel was ineffective for failing to cross-examine witnesses properly (Ground eight);

13. That trial counsel was ineffective for failing to file a motion to suppress the photographic line-up arrays (Ground eight);

14. That trial counsel was ineffective for failing to create reasonable doubt by presenting sufficient evidence to show that Baso Felder was the actual perpetrator of the murder (Ground eight);

15. That trial counsel was ineffective for failing to conduct an individual voir dire of the jurors (Ground eight);

16. That the petitioner's due-process right to a fair trial was violated by the presentation of the perjured testimony of his brother, Roderick Johnson (Ground nine);

17. That the petitioner's due-process right to a fair trial was violated by the state's suppression of the victim's toxicology and autopsy report, which showed that the victim used drugs (Ground ten);

18. That the petitioner's due-process right to a fair trial was violated by the prosecutor's improper

-2-

remarks during closing argument (Ground ten);

19. That the petitioner's due-process right to a fair trial was violated when the state, in its brief to the Tennessee Court of Criminal Appeals, presented an altered version of the prosecutor's closing argument (Ground eleven);

20. That the petitioner's due-process right to a fair trial was violated by the photo line-up arrays because they did not contain a photo of Baso Felder (Ground twelve);

21. That the petitioner was denied the opportunity to present a complete defense including evidence of third-party guilt (Ground thirteen);

22. That the trial court erred by illegally enhancing the petitioner's sentence by factors not decided by a jury in violation of *Cunningham v. California*, 549 U.S. 270 (2007) (Ground fourteen).

(*See* Habeas Petition, ECF No. 2, at 2–4; Habeas Brief, ECF No. 3, at 8, 15–63.)[2]

Shortly after the petition was filed, the court conducted a preliminary examination thereof and determined that it stated colorable claims for relief. Accordingly, the court entered an order (ECF No. 9) directing the respondent to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases.

The respondent submitted his answer (ECF No. 16), to which the petitioner has offered no reply. Upon consideration of the petition, the answer, and the expanded record, it appears that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the court shall dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

## II.     FINDINGS OF FACT

### A.     Evidence Presented at Trial

The facts underlying the petitioner's conviction were summarized by the Tennessee Court of Criminal Appeals as follows:[3]

---

[2]The respondent identifies 19 claims and does not address Claims 7, 11, and 15. The court notes that those three claims were not actually identified by the petitioner in his petition or in the list of issues in his brief in support of his petition, but he addresses them in the argument section of his brief.

[3] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall

On the evening of October 24, 1997, William Edwin Binkley was attacked and stabbed forty- one times in his apartment on Whitsett Road in Nashville, Tennessee. The stabbings resulted from an altercation between the victim, Binkley, and two men who were observed both when they entered the victim's apartment and when they departed approximately one hour later. One of the suspects was subsequently identified as Defendant by two eyewitnesses present at the crime scene; the other was not positively identified by the eyewitnesses, but Defendant's brother, Roderick Johnson, was found guilty of second-degree murder as the other offender in the killing based on additional evidence presented at the trial. The case of Roderick Johnson is not before the Court in this appeal.

The altercation began shortly after Defendant and his brother knocked on the door of Binkley's apartment at approximately 9:00 p.m. and were admitted inside. Within a few minutes, some of the neighbors heard yelling and sounds of a struggle—like someone was being physically thrown and dragged about the apartment. The neighbor living in the apartment adjacent to Binkley's reported that he heard one of the perpetrators shout, "Where's my money? I want my money" and "I'm going to shoot you." The neighbor who lived in the apartment directly below the skirmish heard Binkley cry out, "Oh God, help me. They're killing me. Oh God, help me." The commotion continued for approximately one hour. At least three residents living in nearby apartments called 911 to report the melee, but they were unable to talk with anyone for at least twenty minutes. The neighbors who did finally make contact with the emergency dispatcher were informed that there were not enough police officers available to respond to their call.

Vickie Miller, one of the neighbors who became frustrated by her own futile attempts to secure police assistance, telephoned Binkley's mother, Frances Hampton, at work and told her to come home immediately "because someone was killing Willie [Binkley]." Hampton lived in the same apartment complex as her son. Arriving at home a few minutes later, she observed a crowd of residents gathered at the bottom of the stairs leading to her son's apartment. They cautioned her that the two men seen entering Binkley's apartment earlier had not come out yet. Notwithstanding the warning, Hampton marched up the stairs and banged [on] the door to her son's apartment three or four times shouting, "Open the door. Open the door." She received no response.

Hampton had walked half-way back down the stairs when the door to Binkley's apartment suddenly flew open. Two African-American men emerged. The first was tall and slim; the second was shorter and heavier. Both men passed Hampton, who had remained standing on the stairs, and then pushed past the crowd which had gathered at the bottom. As the stockier man passed Hampton, he paused briefly. She noticed he was sweating profusely; he wiped his face with a cloth and threw it on the ground. Hampton "looked him right in the face" at this point. Although it was dark that night, Hampton claimed she was able to see the stockier man well enough to positively identify him later as the Defendant.

The two men headed immediately for the parking lot. Hampton called out for someone to get the license number of their car, and then ran up the stairs into her son's apartment. The interior was in great disarray, and Binkley was lying on the floor in a fetal position. His neck was cut and blood was everywhere, but he was still conscious and made the following statement to Hampton: "Momma, I didn't owe them any money. I didn't owe them any money." As the ambulance prepared to transport Binkley to Vanderbilt Hospital, the police officers began to arrive. Hampton followed the ambulance and her son to Vanderbilt Hospital where he died three days later, on October 27, 1997. The cause of death was determined to be the combined result of forty-one stab wounds to the head, neck,

---

have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

torso, and extremities; some of the wounds were superficial, but others, i.e., the wounds to the lung and liver, were termed "critical." The doctor who testified at trial regarding the cause of death further opined that more than one weapon was probably used to kill Binkley.

Derrick Shawn Barrett and his wife lived in the same apartment complex as Binkley. Just prior to the stabbing incident, at approximately 8:30 or 9:00 p.m., the Barretts were returning from a shopping trip when Mr. Barrett noticed an African-American infant asleep in a vehicle as they walked through the apartment parking lot. The baby was strapped into a child's car seat located on the back seat of the vehicle, the windows were down, and the vehicle was unattended. The Barretts were concerned for the baby's safety. Since they could see the parking lot from their apartment, they went home and kept a watch on the car from their window. After twenty or thirty minutes passed and no one came to check on the baby, Barrett wrote down the license plate number of the car, and Mrs. Barrett called 911 to report the possibility that someone may have abandoned a child. Approximately one hour after Barrett first noticed the infant, he observed two men walk hurriedly across the parking lot and get into the car with the baby in it. It was dark and he could not see their faces, but he was able to determine that they were African-American. Barrett described the taller man as extremely "hyper" and "on the move." The shorter, husky man seemed calmer and "in control." The husky man drove the vehicle; he backed up slowly, and then headed for the exit with the headlights off. When the men reached the road, the headlights came on and the vehicle began to accelerate. When the police arrived, Barrett gave them the license number of the car. Because Binkley's and Barrett's apartments were located in different buildings, Barrett heard none of the commotion that had occurred at Binkley's building.

At 10:15 p.m. that same evening, Brandy Stoops, another neighbor, left her apartment and walked toward the parking lot. Like the Barretts, Stoops' apartment was located too great a distance from Binkley's apartment for her to hear any of the disturbance while at home. When she reached the parking lot, however, she heard numerous people shouting for an ambulance. At the same moment, she observed two African-American men pushing through a crowd of people, apparently in an attempt to reach a blue, four-door car parked in the parking lot. One man was thin, the other was husky, and she testified at trial that she could see the face of the husky one "clear as day" because he stared at her when they passed by. When the two men reached the car and the thin man hesitated, the husky one banged on the roof of the car shouting, "Come on, let's go, let's go," and then they both jumped into the vehicle. The husky man entered the driver's side and the men started to drive away with the headlights off, but turned them on when they reached the street. Days later, when Stoops discovered what had happened to Binkley, she told the police what she had witnessed and selected Defendant from a photographic lineup as the husky man she saw in the parking lot. Stoops said that she was unable to identify the thin man because the light was poor and his body was turned away from her; by contrast, she claimed her view of the husky suspect was much better. When asked at trial whether she was certain that Defendant was the husky man she observed in the parking lot, she answered affirmatively.

Officers from the Metro Police Department did not arrive at the crime scene until the Metro Fire Department was in the process of transporting Binkley to the hospital. (The actual time the police arrived was not given in the record.) The first police officer on the scene, Edward Westerman, commenced the investigation. Derrick Barrett gave him the license number of the vehicle which had contained the unattended baby and which he had also observed leaving the parking lot with its lights off. A registration check revealed the vehicle was owned by Roderick Johnson, Defendant's brother and co-defendant at trial. At approximately 11:15 p.m., Officer George Bouton, from the Identification Division, also arrived to recover and collect evidence. Officer Bouton took photographs of the blood stains located throughout Binkley's apartment and the broken furniture in each room. He also attempted to recover fingerprints, but was unable to obtain any that were identifiable.

Bouton explained at trial that he did not process the white towel allegedly used by Defendant to wipe his face because no one informed him of its existence or potential relevance.

When Binkley died on October 27, 1997, the case officially became a homicide investigation and Detective Jeff West, assigned to the Homicide Division, was placed in charge. West first re-interviewed the witnesses who were at the crime scene the night of the killing, including Hampton, the victim's mother; the Barretts, who reported the license number of the suspicious vehicle; Stoops, the witness who saw the husky suspect "clear as day"; and the various neighbors who were situated at the bottom of the stairs when the two suspects exited Binkley's apartment. West was able to obtain consistent descriptions of the suspects, but he did not acquire any names as a result of these interviews.

Defendant became a suspect in the killing shortly after the police discovered that the vehicle observed by Barrett at the crime scene was registered to Defendant's brother, Roderick Johnson, and Roderick informed Detective West that he had met the victim through Defendant. The day after the police talked with Roderick, October 28, 1999, West showed the victim's mother, Hampton, a photographic lineup consisting of twelve photographs of African-American males: two groups of six photographs each. Photographs of Defendant and his brother were included in the lineup but placed in different groups. Hampton identified Defendant as the man she saw coming out of her son's apartment, but did not recognize Roderick from his photograph. Later, Stoops similarly identified Defendant from an identical photographic array but similarly failed to recognize Roderick. The remainder of the witnesses who were present at the apartment complex during the stabbing failed to recognize either Defendant or Roderick from the photographs. Regarding photographic lineups in general, West testified at trial that it is the policy of the Metro Police Department to do whatever they can to ensure that the photographic lineups they use are not suggestive: the photographic arrays usually contain persons of the same race, age, build, hairstyle, etcetera. When asked at trial why the investigators did not conduct a physical lineup in Defendant's case, West replied that photographic lineups are quicker and easier to perform. West claimed that, for practical reasons, the police department has almost stopped using physical lineups altogether, and in the ten years he has been a detective, he has never used one.

On November 5, 1997, Detective West gave Officer Charles Ray Blackwood, assigned to the Identification Division, a screwdriver to process as evidence. The screwdriver was discovered by Binkley's mother, Hampton, approximately a week after the stabbing as she was straightening her son's apartment. It was jammed under a coffee table with only the tip visible. West and Blackwood discussed whether the screwdriver should be processed for blood or fingerprint evidence, and ultimately decided that blood evidence would be most helpful to the case. Since the screwdriver had been handled since the killing, the officers believed that tests for fingerprints would not be fruitful.

The next day, November 6, 1997, Officer Raymond Rader was assigned to process the vehicle belonging to Roderick Johnson which Barrett had observed leaving the crime scene after the stabbings. Officer Rader examined the interior for possible blood samples and took photographs of the vehicle, but he did not attempt to recover prints because he received no request from anyone to do so. On the driver's seat was a stain which appeared to be blood. Samples of material recovered from the seat of the vehicle and the screwdriver were sent to the Tennessee Bureau of Investigation's crime lab for analysis, which subsequently determined that both items contained human blood belonging to the victim, Binkley.

At trial, Defendant testified that he met the victim, Binkley, approximately a year prior to Binkley's death. At that time, Binkley and Defendant lived within a couple of blocks of

each other and used drugs together (specifically, marijuana, cocaine, and alcohol). Defendant claimed that although he eventually quit using drugs, he maintained a friendship with Binkley to help him quit also. Defendant would also see Binkley frequently on his way to or from the local pay telephone. Because Defendant did not have a telephone in his home, he used the pay phone near Binkley's apartment to make calls and would stop by the apartment to visit him. Defendant testified that his brother, Roderick, also knew where Binkley lived.

Defendant further testified that he often loaned Binkley money. For instance, in early October 1997, Defendant observed Binkley fighting with some people over a debt for cocaine that was given Binkley on credit. Defendant paid Binkley's debt to keep the drug dealers from harming him. Later that same month, Binkley approached Defendant for more money. Binkley confessed that he had "smoked his money up," but said that he would be evicted from his apartment if he could not pay rent. Defendant initially refused to help him. However, he later relented and gave Binkley approximately forty-five dollars. Defendant testified that he never expected Binkley to pay him back for that favor, or any other "loan" for that matter.

Defendant testified that on the evening of October 23, 1997, the day prior to the stabbing, he bought himself something to drink at a local liquor store and then stopped by Binkley's apartment. Binkley and a friend of his named Joe were smoking cocaine and drinking beer, and Defendant drank for a while with them. When Binkley stepped into another room, Joe started rifling through Binkley's wallet. Defendant told him to stop it, but Joe became belligerent and Defendant left. Later, Defendant encountered Joe again and Joe hit him with his fist. Defendant hit Joe back with the bottle he was carrying, and headed for Binkley's apartment to make sure he was all right. Binkley was angry about something and accused Defendant of rummaging through his belongings. Defendant testified that he tried to explain that Joe was responsible but Binkley was too "high" to listen. Defendant left Binkley's apartment—that was the last time he saw him alive.

Defendant testified that the next day, October 24, 1997, the date of the stabbing, he had a fight with his wife before she went to work. Later that afternoon, Roderick asked him to come to their sister's house for dinner, but Defendant declined because he wanted to be at home when his wife returned from work. His wife arrived at home at approximately 9:00 or 9:30 p.m. Defendant fixed her dinner, and they stayed home for the rest of the evening. At trial, Defendant's wife corroborated Defendant's testimony, testifying that he was home when she arrived at 9:15 p.m. and did not leave until sometime the next morning.

According to Defendant, he first learned of the attack against Binkley on Monday, October 26, 1997. His brother's fiancé erroneously informed him that Binkley had been shot and the police had tried to implicate Roderick. When Defendant arrived at home, his wife told him that the police wanted to talk to him also. He telephoned the police the next day and was arrested on Thursday, October 30, 1997, a few days later.

Defendant claimed that he voluntarily gave the police a statement because he had nothing to hide. Defendant wanted the police to investigate whether his sister's boyfriend, Baso Felder, was the man who was actually with his brother, Roderick, at Binkley's apartment. Defendant told the investigators that he and Felder were similar in appearance and Felder was frequently seen with Roderick. However, when Hampton was shown a photograph of Felder at trial, she denied that he was the man she saw coming out of her son's apartment. In addition, Defendant's sister, Tammy Denise Chatman, testified that Felder and Roderick were at home with her on October 24, 1997, from approximately 6:00 p.m. until after midnight. At trial, Roderick also claimed to be at his sister's home on the evening of October 24 and admitted to having no explanation for how his car could have

been simultaneously observed at Binkley's apartment. Roderick admitted that he was caring for his fiancé's fifteen-month-old daughter that night and that he often traveled with a baby's car seat in his vehicle.

Hampton testified that on October 25th or 26th, a day or two before Binkley died, she was riding in the hospital elevator on her way to see her son when the door opened and Defendant was standing there, waiting to get on the elevator. They looked at each other for a moment, then Defendant turned away and quickly disappeared down a stair well. This upset Hampton. She reported the sighting to a doctor, but he assured her that the man she had observed was an employee and that her son was safe on the hospital's "security floor." Hampton testified that since she had numerous other things to worry about at the time, she did not report the incident to the police. It was a day or two later, on October 28th, that Hampton identified Defendant from photographic lineups. However, she testified that her identification of Defendant was based on a comparison of the man in the photograph with the man who emerged from her son's apartment, and not the man at the hospital. Contrary to Hampton's testimony, Defendant testified that he did not recall ever seeing Binkley's mother at Vanderbilt and, at that time, he did not know Binkley was being treated there.

(ECF No. 18-12, at 135–40.) As stated above, on the basis of this evidence, the petitioner was found guilty of first-degree premeditated murder and sentenced to life in prison without the possibility of parole. His brother, Roderick Johnson, was convicted of second-degree murder.

### B.  Post-Conviction Evidence

The Tennessee Court of Criminal Appeals summarized the facts presented at the post-conviction hearing in its opinion affirming the trial court's order denying post-conviction relief, as follows:

At the post-conviction hearing, Roderick Johnson testified that at trial, he had presented an alibi defense for himself, particularly, that he was at his sister's house at the time of the killing. Johnson stated that this alibi defense was not truthful testimony. His "revised" version of events was that one evening, he, his daughter, and Felder (but not the petitioner) drove to the victim's apartment. Felder went into the apartment; after a while, Johnson left his daughter in the car and went into the apartment to discover the victim lying on the floor and Felder standing over him. When Johnson asked Felder what was going on, Felder told Johnson to be quiet, then knelt on the floor and stabbed the victim repeatedly with a knife, which Johnson later deposited in a dumpster behind the victim's apartment. Ultimately, someone began knocking on the apartment's front door, and both men left the apartment. Johnson testified that he was in the apartment with Felder and the victim approximately twenty to twenty-five minutes before he and Felder left. Johnson testified that this was the first time he had recounted this revised version of events; he claimed that his attorneys at trial and on post-conviction had told him not to address the issue regarding his trial testimony.

The petitioner's three trial attorneys all testified at the hearing. One of the attorneys testified that no motion to suppress the photograph arrays was filed, but the attorneys did challenge the ability of the witnesses to identify the petitioner in the dark on cross-examination. Counsel had no recollection if the police investigated Felder, but that the defense attorneys "always had thought that [Felder] was the person who had committed the murder with Roderick or with whomever." Counsel recalled that one of her main concerns was that "two people had picked [the petitioner] out of a lineup and two people were coming to Court and were going to identify him as having been there." The other two attorneys

reiterated counsel's testimony, with one of the attorneys stating that based on her examination of the photograph arrays at the post-conviction hearing, "there [does] not appear to be any legal basis for filing a lineup motion. I wouldn't file one just to file it."

Detective West testified that Roderick Johnson became a suspect based largely on the identification of his vehicle in the apartment's parking lot the night of the killing. Detective West stated that Johnson had told police that he was not present at the victim's apartment the night of the murder, but that he did not believe Johnson's alibi. He also said that he did not place Felder's photograph in the arrays and did not interview Felder. Detective West said he pursued the Johnson brothers as suspects rather than Felder based on physical descriptions of the suspects and the presence of Roderick Johnson's car at the crime scene.

The petitioner testified that in addition to his attorneys' failure to file a motion to suppress the photograph arrays, his ineffective assistance of counsel claims were based on the fact that his attorneys did not call him to testify about his work history, his lack of a criminal history, and his relationship with his children. He said that appellate counsel failed to challenge the use of a "substitute" medical examiner and failed to challenge the absence of Felder's photograph from the array. On cross-examination, the petitioner admitted that his parents did testify about the positive aspects of his character.

Felder, who testified for the state, denied involvement in the victim's murder. He said that nobody had ever confused him with the petitioner. He said he did not know the victim, despite the fact that he spent plenty of time with both Johnson brothers and knew many of their friends. Felder admitted that prior to the killing, he had an extensive criminal record. He had pled no contest to attempted murder after being accused of shooting someone, and he had also accumulated a drug conviction, domestic violence convictions, and an aggravated assault conviction, for which Felder was on community corrections at the time of the killing. Felder was a mechanic by trade, and owned several screwdrivers.

The victim's mother reiterated that the petitioner was the one she had seen running from her son's apartment the night of the murder. She also denied seeing Felder the night of the murder.

(ECF No. 18-17, at 54–55 (footnote omitted).)

## III.    ANALYSIS OF CLAIMS

Of the twenty-two claims identified by the court, only eight (Claims 1, 2, 9, 12, 14, 15, 16, and 20) arguably concern federal constitutional issues that were fairly presented to the Tennessee state courts for consideration as required by 28 U.S.C. § 2254(b)(1)(A) and are as such properly before this court for review under § 2254(d). Claims 3, 4, 5, 6, and 8 fail to state a cognizable claim for habeas relief and, alternatively, are barred by procedural default because they were not fairly presented as federal constitutional claims in the state courts. Claims 7, 10, 11, 13, 17, 18, and 19 were never presented to the Tennessee courts and are therefore barred by procedural default, assuming they can even be construed to state claims based upon constitutional violations; the two remaining claims, 21 and 22, were not raised in the state courts except in the petitioner's application for permission to appeal to the Tennessee Supreme Court during post-conviction

proceedings. These claims would therefore be deemed waived in the state system due to the petitioner's failure to comply with state procedural rules for preserving claims in the state trial and appellate courts, and are therefore procedurally defaulted for purposes of habeas review. As set forth below, the court finds that none of the claims provides a valid basis for habeas relief.

### A. Procedurally Defaulted or Waived Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[4]

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit

---

[4] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). However, if an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

The petitioner here raises a number of claims that were never presented to the state courts either on direct appeal[5] or during post-conviction proceedings.[6] Specifically, the following claims were never

---

[5] On direct appeal, the petitioner raised the following issues: (1) whether the evidence was legally insufficient to support the conviction; (2) whether the trial court erred in admitting Binkley's statement to his mother into evidence; (3) whether the trial court erred in allowing Frances Hampton to testify in Roderick Johnson's case in chief after she had remained in the courtroom following her initial testimony; (4) whether the prosecutor's improper closing argument required reversal of the conviction; (5) whether the trial court erred in refusing to instruct the jury during the guilt phase that life imprisonment carries 51 years; (6) whether the conviction is a result of the authorities' failure to adequately and properly investigate the case; (7) whether the sentence of life imprisonment without parole must be reversed because the state failed to prove the "heinous, atrocious and cruel" aggravating factor beyond a reasonable doubt; (8) and that trial counsel was ineffective either for failing to videotape the parking lot of the apartment complex where Binkley was murdered or to show the videotape to the petitioner, for failing to conduct an individual voir dire of jurors, and for failing to adequately cross-examine Frances Hampton about inconsistencies in her testimony. (ECF No. 18-12, at 6.)

[6] In his post-conviction brief to the Tennessee Court of Criminal Appeals, the petitioner argued that the trial court had erred in denying his petition for post-conviction relief on the grounds that (1) his trial counsel was ineffective for failing to create reasonable doubt by showing that Baso Felder was the actual perpetrator of the crime of which the petitioner was convicted, and for failing to elicit testimony that the victim never identified the petitioner as the perpetrator of the crime even though he was able to speak prior to his

-11-

presented at all, in any form, to the state courts:  Claim 7, that the trial court's jury instructions were confusing and misleading; Claim 10, that certain medical records suppressed by the prosecution refuted the existence of aggravating circumstances; Claim 11, that the state's introduction of testimony from William S. Greenup violated the Confrontation Clause; Claim 13, that the petitioner's trial counsel was ineffective for failing to file a motion to suppress the photographic line-up arrays; that Johnson's due-process right to a fair trial was violated by the state's suppression of the victim's toxicology and autopsy report, which showed that the victim used drugs; Claim 18, that Johnson's due-process right to a fair trial was violated by the prosecutor's improper remarks during closing argument; and Claim19, that Johnson's due-process right to a fair trial was violated when the state presented an altered version of the prosecutor's closing argument to the Court of Appeals.

It is clear under Tennessee law that no state remedy remains available to the petitioner for seeking review of these claims.  *See* Tenn. Code Ann. § 40-30-102(a) (establishing a one-year statute of limitations for the filing of a petition for post-conviction relief); § 40-30-102(c) (permitting the filing of only one post-conviction petition by state prisoners); § 40-30-117 (setting forth the very narrow grounds under which a petitioner may file a motion in the trial court to reopen his first post-conviction petition).[7]  Thus, the claims are technically exhausted but procedurally defaulted.  *See Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (holding that if an unexhausted claim is procedurally barred under state law, the claim is procedurally defaulted for purposes of federal habeas corpus review).

To obtain review of these claims despite their defaulted status, the plaintiff cannot rely on conclusory assertions of cause and prejudice.  Rather, he must present affirmative evidence or argument as to the precise cause for the failure to raise the claims before the state court and the prejudice that resulted. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citations omitted).  To demonstrate cause, the

---

death during post-conviction proceedings; and (2) that the petitioner's due process right to a fair trial was violated by the presentation of the perjured testimony of Roderick Johnson, by the prosecutor's improper argument to the jury that he did not believe the victim had ever used drugs, and by the preparation and presentation of photographic lineups that did not include a photograph of Baso Felder.  (ECF No. 18-17, at 12–18.)

[7] The Sixth Circuit has found Tennessee's statute of limitations on post-conviction petitions to satisfy all the requirements for the procedural default doctrine.  *Hutchison v. Bell*, 303 F.3d 720, 788–89 (6th Cir. 2002).

petitioner must show that an objective factor external to the defense interfered with his ability to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish prejudice, there must be a showing that the trial was infected with constitutional error. *United States v. Frady*, 456 U.S. 152, 170–72 (1982). The petitioner here has shown neither cause nor prejudice.

For Claim 7, Johnson argues that the trial court's instruction to the jury regarding the burden of proof was "confusing, inconsistent, and misleading" and violated Johnson's "right to a fair trial by lowering the State's burden needed to convict." (ECF No. 3, at 38.) Specifically, the petitioner takes issue with the phrase "or either of them" in the instruction phrased as follows:

> Any person who commits the offense of murder is guilty of a crime. For you to find the defendants, or either of them, guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendants, or either of them, unlawfully killed the alleged victim; and
>
> (2) That the defendants, or either of them, acted intentionally; and
>
> (3) That the killing was premeditated.

(*Id.*) The petitioner does not address the question of cause for not raising this issue in the state courts. And, while the petitioner himself may find this language confusing, he has not shown that the jury was actually confused by it or that Johnson was prejudiced as a result of any such confusion.

For Claim 10, which appears as part of "Ground Seven," Johnson contends that certain medical records suppressed by the prosecution refuted the existence of aggravating circumstances, based upon which his life-without-parole sentence was based. He does not elaborate upon that allegation in his brief in support of his petition, however. As the respondent points out, the petitioner's pleading is insufficient under Rule 2(c) of the Rules Governing § 2254 Cases, because he has failed to provide any facts supporting this ground. On that basis alone, the claim is subject to denial. In addition, he has not alleged any cause for failing to raise the issue sooner, and because the claim does not raise an issue that is cognizable on habeas review, he cannot establish prejudice.

As for Claim 11, which appears in the section of Johnson's brief ostensibly devoted to attacking the alleged lack of evidence of aggravating circumstances, Johnson asserts that the trial court's decision "allowing admission of William S. Greenup's out-of-court statements to police officers, regarding [the] incident

-13-

in which defendant, allegedly stabbed victim[,] violated the Confrontation Clause. . . ."  (ECF No. 3, at 51.)  The "testimony" to which the petitioner objects, however, is co-defendant's counsel's closing argument, during which the attorney summarized the state's theory of the crime.  While it appears that information received from William S. Greenup (a fellow prisoner who claimed that Johnson confessed to him while they were housed together in pretrial detention) was used by the state in obtaining the indictment against Johnson, the petitioner admits that Greenup was not called as a witness during trial, and his out-of-court statements were never referenced during trial nor presented to the jury.  Johnson nonetheless asserts that his right to confront his accuser was violated, and he was prejudiced, by the trial court's decision to "allow[] the State and co-counsel to constantly place Greenup's theory . . . before the jurors."  (ECF No. 3, at 52.)  Johnson offers no cause as to why this claim was not raised sooner, and he offers no proof that an error of constitutional dimension occurred or that he was prejudiced as a result.

In Claim 13, Johnson asserts that his trial attorneys were ineffective based on their failure to file a motion to suppress the photographic lineup arrays.  As the respondent points out, Johnson listed this claim in his initial state post-conviction petition in the Davidson County Criminal Court (ECF No. 18-13, at 137), but he failed thereafter to present it to the Tennessee Court of Criminal Appeals.  (*See* ECF No. 18-17, at 13–14.)  Under Tennessee procedural rules, he would be deemed to have waived that claim for failing to raise it on appeal.  *See* Tenn. Crim. Ct. App. R. 10(b).  The claim is therefore procedurally defaulted for purposes of habeas review.  Regardless, Johnson has not shown cause for the failure to exhaust the claim in the state proceedings, and he has not argued, nor could he show, that he was prejudiced by his trial counsel's failure to file a motion to suppress.  In the first place, there is no suggestion in the record that such a motion would or should have been granted.  Second, the substantive issue he claims should have been raised in a motion to suppress—the admissibility of the identifications based on the photographic arrays— was considered on direct appeal by the Tennessee Court of Criminal Appeals, which roundly rejected the petitioner's argument that the trial court had erred in admitting the identifications.  Finally, as discussed in part III.C(1) below, the state appellate court's conclusion was not based on an unreasonable construction of federal law.

Claim 17 concerns the suppression of the toxicology report showing William Binkley had ethanol and cocaine metabolite in his system at the time of his death.  Again, the record reveals that Johnson never fully

and fairly presented this claim to the Tennessee state courts either on direct appeal or in post-conviction proceedings. Johnson has not demonstrated cause for his failure to raise this claim in the state court. Further, while he contends that he was prejudiced by the suppression of this information, he has not shown how. Rather, it is clear from the record that the question of whether William Binkley did drugs is simply not relevant to the petitioner's conviction or sentence.

For Claim 18, the petitioner asserts that his right to a fair trial was violated by the prosecutor's statement during closing argument that he did not believe the victim, William Binkley, used drugs. Although the petitioner raised a state-law-based argument concerning the substance of the prosecutor's closing argument on direct appeal (Claim 5, discussed in part III.B(3), below), he did not raise this particular argument on direct appeal. He did raise it during post-conviction proceedings (*see* ECF No. 18-13, at 139), but the trial court rejected the argument, noting incorrectly that the claim had already been raised and considered on direct appeal. If the trial court had recognized that the issue had never been raised on direct appeal, it would have concluded based on Tennessee law that the issue was waived. (*See* 7/19/2006 Order (Davidson Cnty. Crim. Ct.), ECF No. 18-13, at 158 (noting that under Tenn. Code Ann. § 40-30-106(g), "[a] ground for relief is waived if the petitioner . . . failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been presented" unless certain inapplicable exceptions applied).) The Tennessee Court of Appeals likewise did not consider the argument on post-conviction appeal; instead, it characterized the issue generally as an attack based on "improper statements made by the prosecutor during closing argument at trial" (ECF No. 18-17, at 57), and stated that, "in this post-conviction appeal, we may not consider these previously determined issues." (*Id.* at 58.)[8] Regardless of whether the issue was waived in the state courts and therefore procedurally defaulted for purposes of habeas review, the issue is without merit. It does not raise a claim of error of constitutional dimension, and the plaintiff offers only conjecture in support his claim that he was prejudiced by the allegedly improper statements. And, as the court has already stated, the question of whether the victim used drugs is not relevant to the petitioner's case.

---

[8]The trial court also found that this issue was not properly before it because it had "been previously determined on appeal." (ECF No. 18-13, at 160 (citing *State v. Johnson*, at 14.)

Claim 19 involves the petitioner's assertion that his due-process rights were violated when the state, in its brief to the Tennessee Court of Criminal Appeals, allegedly submitted the prosecutor's closing argument falsely. (ECF No. 2, at 4.) The petitioner asserts that he did not raise this claim earlier because he did not have "access to all of [his] facts" at the pertinent time. (*Id.*) Regardless, this claim is not supported by any citation to the factual record to indicate what the alleged misrepresentation was or how the petitioner was prejudiced by it. (*See* ECF No. 3, at 60.)

In addition, Claims 21 and 22 were not submitted to the state courts until the petitioner included them in his *pro se* Application for Permission to Appeal to the Tennessee Supreme Court, from the Tennessee Court of Criminal Appeals' denial of his petition for post-conviction relief. (*See* ECF No. 18-17, at 62–63.) The Tennessee Supreme Court denied the application to appeal. (ECF No. 18-17, at 68.) In these claims, the petitioner contends that he was denied the opportunity to present a complete defense, including evidence of third-party guilty, citing *Holmes v. South Carolina*, 547 U.S. 319 (2006) (ECF No. 1, at 4), and that the trial court erred by illegally enhancing his sentence by factors not decided by a jury, in violation of *Cunningham v. California*, 549 U.S. 270 (2007).

Because Johnson failed to present these claims in a motion for a new trial, or in his appeal to the Court of Criminal Appeals, the claims were not properly presented for review by the Tennessee Supreme Court and likely would have been deemed waived under state rules. *State v. Butler*, 108 S.W.3d 845, 854 (Tenn. 2003) (citing Tenn. R. App. P. 3(e)). Because the issues have never been fully and fairly presented to the state courts, and state procedural rules bar the state courts from further consideration of them, the claims are deemed exhausted but procedurally barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. at 752–53. The plaintiff, moreover, has not shown cause for failure to raise these issues on direct appeal other than to argue that he "did not have knowledge of those particular facts until now." (Petition at ¶ 13; ECF No. 1, at 4–5.) He has not shown prejudice. His situation is not analogous to that of *Holmes* or *Cunningham*, and, in any event, Johnson has not pointed to facts in the record that support his claim that he was prevented from presenting a complete defense in the trial court, or that his sentence was enhanced based on judge-found facts.

In sum, Johnson has not shown the cause and prejudice needed to excuse his procedural default

-16-

as to any of these claims. Specifically, he has not shown that any of the defaulted claims concerns an error of constitutional dimension. The court finds that the petitioner has forfeited the right to federal review of these procedurally defaulted claims. *See Teague v. Lane*, 489 U.S. 288, 298–99 (1989) (denial of a claim is appropriate when the claim was not raised in the state appellate courts for review).

### B.     The Claims Grounded in Alleged Violations of State Law

As discussed above, before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the state the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). To provide the state with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim. *Id.* at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim is "fairly presented" where the petitioner "asserted both the factual and legal basis for his claim to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted). There are four ways a petitioner can "fairly present" his federal constitutional claim to the state courts:  through—

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Id.* (citation omitted).

Aside from the exhaustion requirement, a federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). Thus, even assuming a particular claim is exhausted, the claim must present a federal issue in order for the habeas court to review it at all; a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758

F.2d 1431, 1433 (11th Cir. 1985)).

As stated above, Claims 3, 4, 5, 6, and 8 fail to state a cognizable claim for habeas relief and, alternatively, are barred by procedural default because they were not fairly presented as federal constitutional claims in the state courts. Each of these claims is addressed below.

### (1) Claim 3: That the Trial Court Erred in Admitting the Victim's Hearsay Statements (Ground Two)

At trial, the court allowed the victim's mother, Frances Hampton, to testify that when she came into her son's apartment and found him lying on the floor bleeding profusely from multiple stab wounds, he told her, "Momma, I didn't owe them any money." The trial court overruled defense counsel's objection to the admission of this testimony on the basis that the statement qualified under the Tennessee Rules of Evidence as either a dying declaration or an excited utterance and as such was excepted from the hearsay rule.

Johnson asserts that the trial court erred in admitting the statement because the statement neither qualified as a dying declaration under Rule 804(b)(2) of the Tennessee Rules of Evidence, nor as an "excited utterance" under Rule 803(2) of the Tennessee Rules of Evidence, and that the trial court's error was not harmless. In response, the respondent argues that petitioner's challenge to the admission of the victim's out-of-court statement fails to state a cognizable claim for habeas relief and, alternatively, that even if the claim is construed to state a claim based on violation of the Confrontation Clause it is barred by procedural default. The court agrees that this claim is without merit.

First, the claim is based solely on a purported state-law error. On direct appeal, the petitioner simply claimed, as he does here, that the statement did not qualify as a dying declaration or an excited utterance under the Tennessee Rules of Evidence, that the trial court erred in admitting the statement, and that this error was not harmless. (*See* Petitioner's Appellate Brief at 29–34, ECF No. 18-12, at 31–36.) His argument clearly does not involve an alleged "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Generally speaking, errors of state law, such as the improper admission of evidence, do not support a writ of habeas corpus. *Estelle v. McGuire*, 502 U.S. 62, 67(1991); *Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006). Moreover, this court notes that the statement at issue ("Momma, I didn't owe them any money.") technically was not hearsay at all, as it was apparently not admitted for the truth of the matter

asserted.  Tenn. R. Evid. 801(c).[9]  Thus, even if the trial court erred in concluding that the statement fit within the excited-utterance or the dying-declaration exception to the hearsay rule, there was no error under state law in admitting it.

Second, even if the claim could be broadly construed as raising a claim under the Confrontation Clause of the United States Constitution, such a claim is procedurally defaulted for purposes of habeas review, and Johnson has not shown either cause or prejudice resulting from his failure to raise the claim as a constitutional issue before the state courts.  On that basis alone, the petitioner has failed to state a viable claim for habeas relief.  Regardless, even if the claim were not defaulted, the court would find that it is without merit.

The Sixth Amendment to the United States Constitution, made applicable to the states via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  The Supreme Court construes this provision, commonly referred to as the Confrontation Clause, to guarantee a defendant's right to confront those "who 'bear testimony'" against him.  *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  *Crawford* established that the Confrontation Clause bars the "admission of *testimonial statements* of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53–54 (emphasis added).  In announcing this rule, *Crawford* did not provide a "comprehensive" definition of "testimonial" hearsay, *id.* at 68, but it did offer initial guidance on the meaning of the term.  The Court explained that "testimony" involves "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"  *Id.* at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).  And it explained that testimonial hearsay at a minimum includes "a formal statement to government officers" by "[a]n accuser" in the form of an affidavit, a deposition, prior testimony or the like.  *Id.* at 51–52.  Thus, testimonial evidence includes testimony given at preliminary examination, at a grand jury, former trial, and police interrogations.  It does not include a casual remark to an acquaintance, business records, or statements made in furtherance of a conspiracy.  *Id.* at 51,

_____

[9] It was introduced instead to substantiate the state's theory of motive:  the prosecution argued that Johnson killed Binkley over a debt.  The state, in offering Binkley's statement, did not intend to prove that Binkley did not owe Johnson money, but that the killing itself was about money.

-19-

55.

The victim's statement to his mother in this case was not "testimonial" under that definition, so its admission under state evidentiary rules did not violate the Confrontation Clause. *See United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007) (holding that Confrontation Clause had no application to "non-testimonial" out-of-court statements that were properly admitted into evidence under hearsay rules), *cert. denied*, 552 U.S. 1103 (2008). This issue therefore does not provide a basis for habeas relief.

### (2)    Claim 4:   That the Trial Court Erred When It Allowed Frances Hampton to Testify in Violation of Rule 615 of the Tennessee Rules of Evidence (Ground Three)

Johnson takes issue with the fact that the trial court allowed counsel for co-defendant Roderick Johnson to call Binkley's mother, Frances Hampton, as a rebuttal witness—specifically to address the photograph of Baso Felder introduced by Robert Johnson during trial. Johnson claims that he had requested sequestration of all witnesses prior to the start of trial under Rule 615 of the Tennessee Rules of Evidence, and that Hampton had been in the courtroom and unsequestered since giving her testimony early in the course of the trial. Johnson argues that permitting her to testify violated Rule 615.

Again, the respondent argues and the court agrees that this claim is premised solely upon a purported error of state evidentiary law. Habeas relief may only be granted on the grounds that a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For an evidentiary ruling to give rise to a habeas claim, the petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles*, 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)). Stated differently, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006) (quoting *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002)). Johnson has not shown that he was prejudiced by the testimony at issue, or that its inclusion was so egregiously unfair that it violated his fundamental right to a fair trial.[10]   Relief on the basis of this claim must therefore be denied.

---

[10] The merit of this objection is questionable in any case. Rule 615 requires the court to order the exclusion of witnesses, including rebuttal witnesses, during trial upon the request of either party, until after the witness has testified. However, the rule also states that it "does not forbid testimony of a witness called

-20-

(3) **Claim 5: That the Trial Court Erred by Allowing the Prosecutor to Make Improper and Prejudicial Remarks during Closing Argument (Ground Four)**

On direct appeal, Johnson, then represented by counsel, argued that

[a]lthough the State will argue that the [prosecutor's] statement only relates to the concept that a victim's drug use should not excuse a murder, that argument should not be accepted at face value. In reality, the prosecutor was telling the jury that the "system failed" Binkley for the first time when 911 and the police failed to respond [ to calls in a timely fashion] and that it would fail him "one more time" if the jury did not convict these defendants of the charges. In other words, the prosecutor was attempting to analogize a not guilty verdict to the gross ineptitude of 911 and the police in this case.

(Doc. 18-12, at 40.) The Tennessee Court of Criminal Appeals rejected Johnson's argument, finding, first, that he had waived it by failing to object to the prosecutor's statement during trial, and second, that the "prosecutor's comment was intended merely to defuse any possible prejudice that the jurors might have against the victim based on his drug use. After a careful reading of the prosecutor's statement, we agree that this is a reasonable interpretation and find that the prosecutor's statement did not exceed the proper bounds of argument. . . ." (ECF No. 18-12, at 148.)

Now, Johnson objects to the same portion of the prosecutor's argument but on an entirely different basis: he contends that the prosecutor's argument implied that Johnson had falsely testified that Binkley did drugs, and that he was prejudiced thereby because the "jurors relied on the petitioner's alleged false accusation of the victim's drug use in determining the First Degree Murder verdict against the petitioner vers[us] the Second Degree Murder verdict they returned against the codefendant absent any direct proof that established the petitioner actually was the person that stabbed the victim." (ECF No. 18-12, at 33.)

In the first instance, it is clear that this precise claim was never raised in the state courts and is

---

at the rebuttal state of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness." Tenn. R. Evid. 615. In this case, the trial court held a hearing outside the presence of the jury to consider whether to allow counsel for Roderick Johnson to recall Hampton despite Robert Johnson's Rule 615 objection. The trial court allowed Roderick Johnson to recall Hampton but limited her testimony to answering only the question of whether she recognized the man in the photograph of Baso Felder. The trial court concluded that admission of this evidence did not thwart the purpose of the rule. On appeal, the Tennessee Court of Criminal Appeals first noted that the issue was not included in the petitioner's motion for a new trial, and was therefore waived under Rule 3(e) of the Tennessee Rules of Appellate Procedure "unless the issue would result in the dismissal of the prosecution against the accused if found meritorious." (ECF No. 12, at 146 (citing State v. Keel, 882 S.W.2d 410, 416 (Tenn. Ct. Crim. App. 1995)).) The court held that even if the trial court had erred, such error "would not require dismissal of the charges against Defendant and, therefore waiver is appropriate." (ECF No. 18-12, at 147.) The court also found, however, that the trial court did not abuse its discretion in admitting the testimony, as the factual record was consistent with a finding of surprise and need.

-21-

therefore procedurally defaulted for purposes of habeas review. Regardless, as the respondent argues, the petitioner's contention fails to state a claim upon which habeas corpus relief can be granted, because the petitioner has not pleaded a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Generally, for an evidentiary ruling to give rise to a habeas claim, the petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles*, 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)). Stated differently, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006) (quoting *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002)). Johnson has not shown that he was prejudiced by the testimony at issue, or that its inclusion was so egregiously unfair that it violated his fundamental right to a fair trial.

Relief on the basis of this claim must therefore be denied.

### *(4)      Claim 6:  That the Trial Court Erred by Not Instructing the Jury Regarding the Minimum Mandatory Length of a Sentence for Life Imprisonment (Ground Five)*

On direct appeal, counsel for Johnson argued that a recently implemented change in a Tennessee statute "ran afoul of a defendant's due process rights under the state and federal constitutions." (ECF No. 18-12, at 44.) Specifically, prior law *required* the state trial courts, in all contested criminal cases (except for capital crimes) in which a proper motion was submitted by either party, to "charge the possible penalties for the offense charged and all lesser included offenses," and to "include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility." Tenn. Code Ann. § 40-35-201(b) (1997). Effective July 1, 2000, the Tennessee legislature did a complete about-face, revising Tenn. Code Ann. § 40-35-201(b) to *preclude* the judge from ever instructing the jury on possible penalties for the offense charged or for any lesser included offenses.

The state appellate court rejected the petitioner's argument that the change in law violated his due process rights, first on the basis that the only case upon which Johnson relied, *State v. King*, 973 S.W.2d 586 (Tenn. 1998), simply established that the old version of the statute was constitutionally permissible; it did not

establish that the new version was *not*. The court concluded that, because the "Defendant's brief contains no facts or legal authority to support his challenge to the statute's constitutionality, and he has failed to show that he at least requested the jury instructions, we are unpersuaded that the trial court erred." (ECF No. 18-12, at 150.)

In his habeas petition, Johnson has completely abandoned the argument raised during direct appeal. He now asserts, not that the revised statute is unconstitutional, but that the trial court erred in failing to instruct his co-defendant's counsel to *comply* with the amended version of Tenn. Code Ann. § 40-35-201(b). He further argues, now, that co-defendant's counsel violated that provision by arguing during his closing that the evidence presented by the state was sufficient to prove that Roderick Johnson was guilty of second-degree murder, but not sufficient to establish that Roderick committed first-degree murder.

Besides the fact that codefendant's counsel never talked about the possible penalties associated with the possible verdicts at all during that portion of his closing to which the petitioner objects, and setting aside the fact that the petitioner did not raise this precise argument in the state courts, the petitioner's contention fails to state a claim upon which habeas corpus relief may be granted, because the petitioner has failed to plead a violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The question of whether co-defendant's argument violated Tennessee statute is purely a question of state law. Relief on this ground is therefore not warranted.

### (5) Claim 8: That Law Enforcement Did Not Adequately Investigate the Case (Ground Six)

In his brief in support of his habeas petition, Johnson asserts that the police and district attorney "have a duty to reasonably and properly investigate a case, including all reasonable suspects" and that the failure to do so "constitutes a violation of the defendant's due process rights." (ECF No. 3, at 43.) According to Johnson, the investigation leading to his arrest and conviction was constitutionally infirm because the authorities (1) failed to investigate Baso Felder; and (2) failed to discover the screwdriver in the victim's apartment. On direct appeal, he similarly asserted that "the police and the district attorney have a duty to reasonably and properly investigate a case, including all reasonable suspects." (ECF No. 18-12, at 45.) Although he claimed that the failure to perform this duty "constitutes a violation of the defendant's due process rights," this claim was supported only by a citation to an Illinois state case, *People v. Williams*, 588

N.E.2d 983, 1016 (Ill. 1991).  (ECF No. 18-12, at 45.)

The Tennessee Court of Criminal Appeals rejected the claim, noting that the Illinois state case was not binding on it and was factually inapposite anyway, and ultimately concluding that the investigatory errors about which the petitioner (then defendant) complained amounted to nothing more than "exercises of discretionary judgement, typical of those which the police must perform every day." (ECF No. 18-12, at 150.) In addition, the court observed that the petitioner's "allegations of police negligence were presented to the jury through the testimony of various witnesses," based upon which the court presumed that "the jury considered the possibility of police misconduct, but discounted the theory when it convicted Defendant." (*Id.* at 151.)  The court further found that Johnson "presented no evidence of errors which would have affected the result of his trial on the merits, and the record contains no proof that Defendant's substantial rights were affected," and therefore that Johnson was not entitled to relief on that issue.  (*Id.*)

Thus, although Johnson used the words "due process" in his direct appeal, it is clear that he did not satisfy any of the methods outlined above for "fairly presenting" a federal constitutional claim to the state court, or even in his petition to this court:  he did not rely upon federal or state cases employing federal constitutional analysis; he did not phrase the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; and he did not allege facts within the mainstream of constitutional law.  *McMeans*, 228 F.3d at 681; *see id.* ("General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated."). Johnson cannot now remedy his failure to present this claim to the Tennessee state courts in terms of a federal constitutional violation, because Tennessee law does not allow prisoners to raise for the first time on collateral review a claim that could have been brought on direct appeal and because the statute of limitations for raising any such claims on collateral review or otherwise in the Tennessee state courts has long-since run.

In short, Johnson did not clearly present this claim as a federal constitutional issue in the state courts. To the extent Johnson raises a federal claim now, the claim is technically exhausted but procedurally defaulted.  Nor has Johnson demonstrated cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or that failure to consider the claim will result in a "fundamental

-24-

miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), as is required in order to obtain consideration of a defaulted claim. For all these reasons, this issue is not properly before this court for review.

### C.    The Fully Exhausted Federal Claims

Even when a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state courts, this court's review of the state court's resolution of the issue remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Additionally, this court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

-25-

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the court will examine the properly exhausted federal claims raised in Johnson's habeas petition, Claims 1, 2, 9, 12, 14, 15, 16, and 20.

> **(1)     Claims 1 and 2:  That the Trial Court Erred in Admitting the Photographic Line-Up Arrays at Trial and Therefore That the Evidence Was Insufficient to Support the Petitioner's Conviction for First-Degree Murder**

Johnson asserts that the only evidence presented by the state in support of his conviction was circumstantial in nature except for the eye-witness identifications made by the victim's mother, Frances Hampton, and neighbor, Brandy Stoops, but that these identifications are "fraught with problems" of constitutional magnitude. (Doc. No. 3, at 16.) He argues that the remaining evidence, if these eye-witness identifications are excluded, is insufficient to support his conviction. The respondent concedes that these claims present federal constitutional issues and were properly exhausted in the state-court proceedings, but he contends that the Tennessee Court of Criminal Appeals' rejection of these arguments did not involve an unreasonable application of established federal law and was not based on an unreasonable determination of the facts in light of the evidence before the state court. The court agrees.

In habeas cases, this court "review[s] the sufficiency of the evidence supporting a jury verdict, through the framework of § 2254(d), to determine whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime

-26-

beyond a reasonable doubt." *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)). This standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. "The mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir. 2003) (citation omitted).

The petitioner's sufficiency argument in this case hinges upon his contention that the eyewitness testimony itself was constitutionally infirm and that the trial court should have excluded it. While recognizing the "hazards of initial identification by photograph," namely the risk of "convictions based on misidentification," the Supreme Court has repeatedly refused to prohibit the use of the practice "as a matter of constitutional requirement." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Instead, the Court has held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* The Sixth Circuit, following *Neil v. Biggers*, 409 U.S. 188 (1972), later clarified that, where it is alleged that an allegedly suggestive pre-trial identification "cast an impermissible taint on a later in-court identification," courts should first determine whether the procedure was in fact unduly suggestive, and if so, consider the five factors set out in *Neil v. Biggers* to evaluate whether under the totality of the circumstances the identification was nonetheless reliable and therefore admissible. *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (citations omitted).

Johnson raised an identical argument on direct appeal to the Tennessee Court of Criminal Appeals. That court disposed of Johnson's sufficiency-of-the-evidence claim, which in turn hinged upon his claim that the trial court erred in admitting the eyewitness identifications that were based on pretrial identification of Johnson in a photographic array, with reference to the federal standards as set forth in *Jackson v. Virginia*, 433 U.S. 307 (1979) (pertaining to the sufficiency of the evidence), and *Neil v. Biggers*, 409 U.S. 188 (1972) (pertaining to identification procedures). The appellate court articulated the elements of the crime and reviewed the evidence presented in light of Johnson's objections, before rejecting his contention that the identifications based on the photographic arrays were inadmissible and therefore concluding that the

evidence was sufficient to support the conviction for first-degree murder:

> To recount, the two eyewitnesses in this case are Hampton, the victim's mother who identified Defendant as the man she saw leaving her son's apartment, and Stoops, the neighbor who observed Defendant get into his brother's vehicle and drive away. Defendant maintains that both eyewitness identifications should be disregarded as unreliable for two reasons: (1) the photographic lineups failed to contain a photograph of Baso Felder, the man Defendant alleges may have accompanied his brother on the night of the stabbing, and (2) the lineups failed to contain photographs of other African-American males who frequented the neighborhood surrounding Binkley's apartment.

> Photographs contained in a photographic lineup are not required to mirror the accused. *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998). The law requires merely that the police refrain from unnecessarily suggestive identification procedures. *See Neil v. Biggers*, 409 U.S. 188, 198-99 . . . (1972). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *Hall*, 976 S.W.2d at 153 (quoting *Stovall v. Denno*, 388 U.S. 293, 301-302 . . . (1967)).

> According to the record, Detective West testified that the procedure used by the officers to select photographs for the lineup in this case was, as is the practice with all lineups, not weighted for or against any particular person. Further, the police officers in charge of the investigation did everything practicable to ensure that the identification was free from suggestions on their part, e.g., the photographs were of men who were similar with respect to age, build, and hairstyle. We note that although a photograph of Baso Felder was allegedly not included in the photographic lineup, the record shows that Hampton had the opportunity to view a photograph of Felder in court at which point she testified that Felder was not the man who came out of her son's apartment. Thus, it appears that the presence of Felder's photograph in the lineup would have been immaterial, and its absence cannot be said to have prejudiced Defendant. Since Defendant did not provide this Court with either a photograph of Felder or a copy of the photographic array he contends was unreliable, we are unable to consider this specific matter further. As a result, we conclude that the photographic identification was not so unnecessarily suggestive and conducive to irreparable mistaken identification that Defendant was denied due process of law and, therefore, the identifications from the lineups were properly admissible for consideration by the jury.

> . . . .

> On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *[State v.] Cabbage*, 571 S.W.2d [832,] 835 [(Tenn. 1978)]. Accordingly, after a thorough review of the record and the arguments presented, we find the evidence sufficient to sustain Defendant's conviction. Defendant is not entitled to relief on this issue.

(Doc. No. 18-12, at 140–43.)

The appellate court's conclusions that the photographic identification procedure was not unduly suggestive, and that the evidence presented was sufficient to support the conviction, were based upon a correct statement of the elements of a charge of first-degree premeditated murder and upon the appropriate federal standards.

-28-

In raising the issues of the sufficiency of the evidence and the admissibility of the out-of-court identifications before this court, the petitioner has not pointed to any law, nor is this court aware of any, that requires that all potential suspects be included in the same photographic array. Rather, the question the court must ask in determining whether the pretrial identification procedure was unduly suggestive is whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009), *cert. denied sub nom Cornwell v. Bobby*, --- U.S. ---, 130 S. Ct. 1141 (2010). Only if there is some showing that the identification procedure was unnecessarily suggestive must the court go on to evaluate "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. Here, the evidence in the record indicates that the police procedure, as the Tennessee Court of Criminal Appeals noted, was not weighted for or against any particular person, and the police officers in charge of the investigation testified that they ensured that the photographs in the array were of men who were all of similar age, build, and hairstyle. Because the petitioner has not carried his burden of establishing that there was anything unduly suggestive about the array, there was no need for the state court to go on to consider the second part of the *Neil v. Biggers* analysis, addressing the reliability of the identifications despite the suggestive nature of the confrontation.

In sum, the Tennessee Court of Appeals' decision that the police procedure based upon which the eyewitnesses selected Johnson's photograph from a photographic line-up was not unduly suggestive was based upon a reasonable application of controlling federal constitutional law as determined by the United States Supreme Court. That determination necessarily led the court to conclude, reasonably, that the evidence of record was sufficient to support the conviction. The state court's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Claims 1 and 2 are without merit, and relief on the basis thereof must be denied.

### (2) Claim 9: That the State Failed to Prove the Statutory Aggravating Circumstances beyond a Reasonable Doubt (Ground Seven)

Pursuant to Tennessee statute, a jury called upon to determine whether a defendant is guilty of first-degree murder does not fix punishment as part of the verdict. Tenn. Code Ann. § 39-13-204(a) (1997). Rather, a separate hearing is conducted, after which the jury determines whether the defendant should be

sentenced to death, to imprisonment for life without possibility of parole, or to imprisonment for life with the possibility of parole. *Id.* The statute further provides that the jury may not impose a sentence of imprisonment for life without possibility of parole unless it unanimously finds that the state has proven beyond a reasonable doubt the existence of one or more statutory aggravating circumstances. One of the statutory aggravating circumstances is that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *Id.* § 39-13-204(i)(5).

In the present case, the state gave timely notice that it intended to ask for a sentence of life imprisonment without the possibility of parole in the event that Johnson was convicted of first-degree murder. The jury returned that verdict, but at the sentencing hearing the state chose not to put on additional proof of aggravating circumstances. Instead, the state relied upon the evidence presented during the guilt/innocence phase of the trial to prove that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

In his habeas petition, Johnson states, as part of "Ground seven," that "[t]he State failed to prove the existence of the statutory aggravating circumstance beyond a reasonable doubt, because the State never proved the defendant actually did stab the victim." (ECF. No. 2, at 3.) The respondent asserts that the state appellate court's rejection of this argument is not contrary to nor an unreasonable application of clearly established federal law.

Again, this court agrees. First, the fact that the jury found the Robert Johnson guilty of first-degree premeditated murder (while only finding his brother, Roderick Johnson, guilty of second-degree murder) means that the jury unanimously concluded that the petitioner was responsible for Binkley's murder—that is, that he is the person who stabbed Binkley multiple times, thereby causing his death. The evidence in the record, including the testimony of eye-witnesses who identified Johnson as the person leaving Binkley's apartment after a noisy altercation, is clearly sufficient to support that verdict.

In addition, to the extent Johnson's petition and brief can be interpreted as presenting the same argument articulated by his counsel on direct appeal regarding the evidence to support the jury's finding of aggravating circumstances sufficient to support the sentence of life without parole, the Tennessee Court of Appeals, in rejecting this claim on the merits, recited the Tennessee Supreme Court's interpretation of the

state statutory requirements for proving "torture" or "serious physical abuse," and observed that the trial court had appropriately instructed the jury as to the definitions of the terms "heinous," atrocious," and "cruel" as defined by the Tennessee Supreme Court, and also correctly instructed the jury as to the meaning of the terms "torture" and "serious physical abuse," likewise as defined by the state's highest court. The appellate court took note of the evidence presented to the jury to conclude that the jury had reasonably concluded that at least one of the statutory aggravating factors had been proved beyond a reasonable doubt: "Since the jury was given the proper instruction and we do not find a gross abuse of discretion on their part, we also find Defendant's sentence is appropriate." (ECF No. 18-12, at 152.) Specifically, the evidence in the case established that the altercation during which Binkley was stabbed multiple times lasted for approximately an hour. Several neighbors heard the skirmish and attempted to contact 911. The neighbor who lived in the apartment directly below the skirmish heard Binkley cry out, "Oh God, help me. They're killing me. Oh God, help me." (ECF No. 18-12, at 135.)

The appellate court here made explicit reference to the substantive elements of the offense as defined by state law, and appropriately determined that the evidence presented to the jury supported its verdict. It is clear that the state appellate court's decision did not involve an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. *Cf.* 28 U.S.C. § 2254(d). Nor was the decision contrary to clearly established federal law. *Cf. Bell v. Cone*, 543 U.S. 447 (2005) (approving the Tennessee Supreme Court's narrowing construction of the "heinous, atrocious, or cruel" aggravator). Johnson is not entitled to habeas relief on the grounds that the state failed to prove the aggravating factors necessary to support his sentence.

### (3)   Claims 12, 14 and 15:  That Trial Counsel Was Ineffective (Ground Eight)

Johnson claims his trial counsel was ineffective for (a) failing to cross-examine Frances Hampton appropriately;[11] (b) failing to create reasonable doubt by presenting sufficient evidence that Baso Felder was

---

[11] Johnson also argues that his trial counsel erred in failing to properly cross-examine the victim's neighbor, Vickie Miller, concerning her knowledge of the victim's drug use. This argument was raised neither on direct appeal nor during post-conviction proceedings. Because no state remedy is available now for addressing this claim, it is procedurally defaulted. In any event, the argument is utterly without merit, as the petitioner cannot demonstrate that the fact that the victim took drugs made any difference to the jury's finding of Johnson's guilt.

-31-

the actual perpetrator of the murder in this case; and (c) failing to conduct individual *voir dire* of jurors.

### a. Failure to Cross-Examine Frances Hampton Properly

Johnson argues that his counsel should have engaged in a better cross-examination of Frances Hampton to elicit inconsistencies in her testimony. Specifically, Hampton alleged at trial that she had encountered the petitioner while she was at Vanderbilt Hospital visiting her son shortly before his death, but she did not mention this event during her testimony at the preliminary hearing.

To show that he is entitled to habeas relief based on an ineffective-assistance claim, Johnson must show that the state court's rejection of this argument was contrary to or an unreasonable application of clearly established federal law. *Cf. Hinkle v. Randle*, 271 F.3d 239, 247 (6th Cir. 2001). Johnson raised this claim on direct appeal, and the Tennessee Court of Criminal Appeals correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the operative federal standard. Under that standard, to prevail on an ineffective-assistance claim brought on direct appeal, a defendant must first show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To prove this element, the defendant must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. Second, the defendant must prove that he was prejudiced by his counsel's unprofessional errors; that is, that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

After referencing that standard, the appellate court noted that, contrary to Johnson's argument, Hampton was cross-examined about the inconsistency in her testimony. The court concluded "after a review of the facts and circumstances surrounding the legal representation of Defendant, we cannot find the performance of any of Defendant's attorneys was not within the range of competence demanded of counsel in criminal cases." (ECF No. 18-12, at 155.) The court also noted that Johnson failed to prove he was prejudiced by his counsels' purported errors.

Because Johnson has failed to show that the state court's adjudication of this claim involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief on this basis.

### b. Failure to Present Sufficient Evidence to Show that Baso Felder Was the Actual Perpetrator of the Murder

-32-

Although this contention of error is mentioned specifically in Johnson's petition, he does not present any argument in support thereof in his brief. The pleading is therefore insufficient under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner and the "facts supporting each ground." Regardless, Johnson did present the claim in the appeal of the denial of his post-conviction petition, and the Tennessee Court of Appeals correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the source of the governing legal standard. Based on that standard, the appellate court appropriately and reasonably determined that the evidence preponderates against this claim:

> The petitioner contends that he received ineffective assistance of counsel. He claims he is entitled to relief because his attorneys at trial failed to create reasonable doubt by presenting evidence sufficient to show that Baso Felder was the actual perpetrator in this case. . . .
>
> Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland*[, 466 U.S. at 687]. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." [*Id.*] at 694. . . .
>
> The petitioner must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. The performance prong requires the petitioner to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires that the petitioner demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Id.* at 697.
>
> In *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court . . . stated that the range of competence was to be measured by the duties and criteria set forth in *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974). . . . Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to the trial strategy or tactical choices if they are informed ones based upon adequate preparation.
>
> . . . .
>
> The main contention in the petitioner's ineffective assistance of counsel claim is that his attorneys failed to present evidence that Felder was the actual perpetrator in this case. As the petitioner argues in his brief,
>
> > trial counsel *may have been able* to elicit information regarding Mr. Felder that would have been helpful to [Johnson's] position. For instance, trial counsel *should*

-33-

*have shown* that Ba[s]o Felder knew both [Robert Johnson] and [his brother]. and that . . . [Felder] is a mechanic by trade; that as a mechanic, Mr. Felder owns several tools including wrenches and screwdrivers, that the murder weapon in this case was a screwdriver; that the police never interviewed or even contacted Ba[s]o Felder when investigating this case; and that the police never prepared or presented a photographic lineup in this case that included a photograph of Ba[s]o Felder. . . . Trial counsel *could have* also presented to the jury information regarding Mr. Felder's past, including an admission from Mr. Felder that his record shows him to be a very violent person . . . .

(Emphasis added.)

The petitioner's argument, comprised of a series of conclusory musings about what might have been, does not begin to approach the "clear and convincing" standard required by statute. The petitioner fails to show that the failure of trial counsel to pursue Baso Felder as a suspect fell beneath the standard of care expected of defense counsel or that this alleged failure prejudiced the petitioner in any way. As such, the petitioner is not entitled to relief on this issue.

(ECF No. 18-17, at 55–57 (some internal citations omitted).)

Thus, in reaching its conclusion, the state court relied on relevant Supreme Court precedent, and the petitioner has failed to show that the state court's adjudication of the claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. Johnson is therefore not entitled to relief on the basis of this claim.

### (c) Failure to Conduct Individual Voir Dire of the Jurors

Johnson argues that his attorneys' failure to conduct an individual *voir dire* of the jurors amounted to ineffective assistance, because "racial issues loomed large in this case" in light of the fact that it involved the alleged murder of a white person by two black men. (ECF No. 3, at 54.) This argument was raised on direct appeal; in disposing of it the appellate court noted that, although Johnson's counsel had filed a pre-trial motion to conduct individual *voir dire*, the trial court did not rule on it because defense counsel moved to strike the motion during a pre-trial hearing conducted on October 30, 1998. In discussing that claim along with Johnson's other ineffective-assistance claims, the appellate court found that the performance of defense counsel in choosing to strike the motion was generally within the range of competence required in criminal cases. The court further noted that the argument that Johnson was prejudiced by the failure to conduct individual *voir dire* was not supported by any proof, as Johnson's appellate brief contained no citation to authority or references to the record, and the record did not provide any information concerning the racial

-34-

breakdown of the jury, or any other facts indicating possible bias or partiality.  (ECF No. 18-12, at 22.)

Once again, the petitioner has failed to show that the state court's adjudication of the claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court.  Johnson still has not pointed to any evidence in the record regarding the racial make-up of the jury, or pointed to any facts or authority to suggest that he was actually prejudiced by his attorneys' decision to retract their motion to conduct individual *voir dire*. He has not shown that he entitled to relief on the basis of this claim.

> **(4)** **Claim 16:  That Petitioner's Due-Process Right to a Fair Trial Was Violated by the Presentation of the Perjured Testimony of His Brother, Roderick Johnson (Ground Nine)**

Robert Johnson's brother and co-defendant, Roderick Johnson, testified at a post-conviction hearing on behalf of his brother, at which time he recanted his trial testimony and claimed that Baso Felder was the true murderer.  Roderick also stated that he testified differently at trial because he was just following his attorney's advice and trying to keep himself out of trouble.  He claimed he was coming forward now with the truth because "there's an innocent man doing life without parole."  (ECF 18-14, at 19–20.)

Robert Johnson claimed during his post-conviction proceedings that his right to a fair trial was violated by Roderick's perjured trial testimony, that Roderick's post-conviction testimony is "extremely important to the issues in this case" and that the more recent "truthful testimony" is "so strong and convincing tha[t] undoubtedly a different result would have followed had it been presented at trial."  (Doc. No. 3, at 45.) In disposing of this issue, the Tennessee Court of Criminal Appeals noted first that the issue of the allegedly perjured testimony was waived for purposes of a post-conviction appeal because it had not been raised on direct appeal; and alternatively, that if the perjured-testimony issue involved newly discovered evidence, it should have been addressed in a writ of *coram nobis* under Tenn. Code Ann. § 40-26-105.  Waiver and procedural issues aside, the court nonetheless considered the claim on the merits, and found that Johnson "ha[d] not shown that his brother's revised testimony would or even could have led the jury to find differently." (Doc. No. 18-17, at 58.)  In that regard, the appellate court stated that it agreed with the trial court's assessment of the issue, as follows:

> Roderick Johnson's testimony is in direct opposition to the unequivocal testimonies of Ms. Hampton and Ms. Stoops, both of whom identified Petitioner at the crime scene.  In fact, .

-35-

. . the Petitioner was the only individual identified at the scene, and such identifications were confirmed by the witnesses numerous times since the death of the victim. . . . Roderick Johnson's contention that the witnesses mistakenly identified the Petitioner rather than Mr. Felder is tenuous, considering their obvious [differences] in appearance. . . . [T]he police department had ample opportunity to evaluate whether they believed Mr. Felder perpetrated the crime, and despite the Petitioner['s] and Roderick Johnson's contention[s], Detective West and his colleagues determined that he was not involved. The Court finds that sufficient evidence does not exist to conclude that [Roderick] Johnson's latest testimony is truthful and that the Petitioner's fair trial rights were violated.

(*Id.*)

This court notes that neither the state trial court nor the appellate court expressly addressed the constitutional issues raised; both simply concluded that the evidence would have been insufficient for a jury to conclude that Roderick Johnson's post-conviction testimony was truthful, in light of the other evidence in the record and Roderick Johnson's obviously dubious credibility. Since the state court "adjudicated the claim but with little analysis on the substantive constitutional issue," *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007), this court must apply a modified AEDPA deference, under which "a 'careful' and 'independent' review of the record and applicable law," is required, but reversal is not warranted unless "'the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570 (quoting *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)). Thus, the issue before this court is whether the trial court's conclusion that the additional evidence, together with Johnson's assertions that he is actually innocent and that his conviction was based on perjured testimony, did not warrant a new trial establishes a violation of his constitutional right to due process.

In that regard, however, the law is well established that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). *But see id.* at 417 (assuming "for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim"). This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact. *See, e.g.*, *Moore v. Dempsey*, 261 U.S. 86, 87–88 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners'

-36-

innocence or guilt but solely the question whether their constitutional rights have been preserved."); *Hyde v. Shine*, 199 U.S. 62, 84 (1905) ("[I]t is well settled that upon habeas corpus the court will not weigh the evidence. . . ."); *Ex parte Terry*, 128 U.S. 289, 305 (1888) ("As the writ of *habeas corpus* does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined or reviewed in this collateral proceeding.").

In *Blalock v. Wilson*, 320 F. App'x 396 (6th Cir. 2009), a habeas petitioner similarly alleged that his due-process rights had been violated by the state court's refusal to grant him a new trial based on new evidence that his conviction was premised on perjured testimony. The Sixth Circuit rejected his claim because it did "not provide petitioner with the due process constitutional claim he desires." *Id.* at 412. Sixth Circuit precedent establishes that the government must have "knowingly" used perjured testimony at trial in order for the presentation of that testimony to constitute a violation of due process. *Id.* at 413–14 (citing *Burks v. Egeler*, 512 F.2d 221, 229–30 (6th Cir. 1975) (requiring "a showing of prosecutorial involvement in the perjury" in order for the testimony to constitute a due process violation); *King v. Trippett*, 192 F.3d 517, 522–23 (6th Cir. 1999) ("To be entitled to habeas relief, petitioner must show that the prosecution knowingly used perjured testimony."); *Norris v. Schotten*, 146 F.3d 314, 331 (6th Cir. 1998) ("Appellant has also presented no reason for this court to believe that the prosecutors intentionally allowed any witness to perjure herself on the stand.")). *But see Sanders v. Sullivan*, 863 F.2d 218, 224 (2d Cir. 1988) (rejecting the Sixth Circuit's opinion in *Burks* because "[t]here is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency. Such a rule elevates form over substance.").

Like the petitioner in *Blalock*, Johnson has not shown that the prosecutor played a knowing role in the presentation of the allegedly perjured testimony, and has not otherwise shown that the state courts' failure to grant him a new trial after his brother recanted his trial testimony resulted in a constitutional violation. Johnson is not entitled to relief on this ground.

### (5) Claim 20: That Petitioner's Due-Process Right to a Fair Trial Was Violated by Law Enforcement's Use of Photographic Lineup Arrays that Did Not Contain a Photo of Baso Felder (Ground Twelve)

The petitioner raised on direct appeal a due-process challenge to the police officers' failure to include

-37-

a photograph of Baso Felder in the arrays used by the eye witnesses, Hampton and Stoops, to identify Johnson. Although it is arguable, as the respondent claims, that Johnson did not fully and fairly present the issue as a federal constitutional issue in the state courts, the Tennessee Court of Appeals, in considering the question, referred to federal standards when it concluded that

> Photographs contained in a photographic lineup are not required to mirror the accused. *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998). The law requires merely that the police refrain from unnecessarily suggestive identification procedures. *See Neil v. Biggers*, 409 U.S. 188, 198-99 . . . (1972). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *Hall*, 976 S.W.2d at 53 (quoting *Stovall v. Denno*, 388 U.S. 293, 301-302 . . . (1967)).

(ECF No. 18-12, at 142.) As discussed above in connection with Johnson's argument that the trial court erred in permitting the introduction of the identifications based on the photographic arrays that did not include a picture of Felder, the appellate court went on to consider the specific procedures used in Johnson's case and specifically observed that the police officers had testified that the lineups were not weighted and that the photographs among which Johnson's was included, and from which Hampton and Stoops both identified the petitioner, "were of men who were similar with respect to age, build and hairstyle." (*Id.*) The court also noted that, although Baso Felder's photograph was not included in the array, Hampton had the opportunity to view a photograph of Felder in court, at which time she testified that Felder was not the man who exited her son's apartment the night of the murder. The court concluded on that basis that "it appears that the presence of Felder's photograph in the lineup would have been immaterial, and its absence cannot be said to have prejudiced Defendant." (*Id.*) Further, the court stated that the petitioner had not provided the court with a copy of Felder's photograph or of the array he contended was unreliable, so it could not consider the matter further. On the basis of the evidence before it, the court held that "the photographic identification was not so unnecessarily suggestive and conducive to irreparable mistaken identification that Defendant was denied due process of law." (*Id.*)

The appellate court's decision is not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The state court relied on the relevant Supreme Court precedent, *Neil v. Biggers*, and a Tennessee Supreme Court case which, itself, relied on *Neil*, and considered the question of whether the police had used unnecessarily suggestive identification procedures. The petitioner has failed to demonstrate

that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence before that court. He is not entitled to habeas relief on this ground.

## IV. CONCLUSION

The court recognizes Johnson's implicit claim of actual innocence. Notwithstanding that claim, it is apparent that the petitioner's trial, appellate, and post-conviction counsel all functioned reasonably effectively, and the state courts did not commit any errors of constitutional dimension. Metro law enforcement certainly could have functioned at a higher level in many ways—most obviously by responding appropriately to the 911 calls for help in a timely fashion, which likely would have saved William Binkley's life. In addition, the police officers charged with the investigation inexplicably failed to retrieve evidence that could possibly have yielded either DNA evidence or fingerprints. As a result, there is no DNA evidence lurking in the evidence files in this case, and Mr. Johnson, if indeed he is innocent, has no hope of exonerating himself short, perhaps, of obtaining a confession from Baso Felder himself.

In the meantime, the court finds that Johnson's habeas petition does not present any meritorious issues. The petition will therefore be denied and this matter dismissed. An appropriate order will enter.

Aleta A. Trauger
United States District Judge